THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : 3:22-CR-72 |
| | : (JUDGE MARIANI) |
| CORNELIUS GREEN, | : |
| | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

On February 23, 2022, Defendant Cornelius Green was charged in a two-count Indictment with one count of Conspiracy to Interfere with Commerce by Robbery in violation of 18 U.S.C. § 1951 and one count of the Use of a Firearm in Furtherance of a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A). (Doc. 1). Here, the Court considers Defendant's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment to the United States Constitution (Doc. 16). With the Motion, Defendant seeks to suppress evidence seized pursuant to the Application for a Search Warrant submitted by Special Agent Michael McKinney on January 5, 2021 (Doc. 16-4, Ex. A). Because Defendant seeks suppression pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), (*see* Doc. 17 at 13-16), as a preliminary matter, the Court must determine whether Defendant demonstrates that he is entitled to a *Franks* hearing. The pending Motion is fully briefed (Doc. 17; Doc. 25; Doc. 26) and ripe for disposition. For the reasons that follow, the Court concludes that Defendant has not shown that he is entitled to a *Franks* hearing.

## II. FACTUAL BACKGROUND

Because the issue of whether a *Franks* hearing is required rests on the Affidavit in Support of the Search Warrant Application, the Court will include the relevant portions of the Warrant Affidavit (Doc. 16-4, Ex. A) below:

14. On July 22, 2020, Ishmael Snowell was kidnapped at gunpoint by Wong, Green and Murphy.

15. Snowell met Wong, Murphy and Green at a Ramada Inn in Pottsville ostensibly to resolve a dispute he had with Wong. During this meeting, Wong grabbed Snowell by the neck and slapped his face. He pulled out a gun, pointed it at his face, and made Snowell watch as he went through his phone. Wong discovered that he had a new residence and told Snowell he was taking him there. Wong then took his car keys while holding him at gunpoint with what he believed to be a Glock 40 or some other large caliber Glock. Wong also produced a body bag and told him that they were going to his place to take the rest of his belongings. Wong also made threats against his mother and girlfriend.

16. At that point, Wong – along with Green and Murphy – forced him at gunpoint into a car. Once inside Green and Murphy applied the door and window locks to prevent Snowell from getting away.

17. Wong followed the car for a short distance on his motorcycle. During this time, Green and Murphy handed the gun back and forth to each other inside the vehicle. Once they arrived at the destination, Green began to take pictures of the house and told Snowell that they want "the money and duffel bags." Green and Murphy used a GPS device to guide them to the Snowell's residence and they also used a cell phone to communicate with Wong and receive instructions.

18. Green and Murphy attempted to break inside the house before eventually entering through the garage. They went through Snowell's belongings and when they did not find anything, they made a phone call for further instruction. Snowell heard a male voice he believed was Wong instruct them to shoot Snowell. Green held the gun to Snowell's head, but Snowell

2

pleaded with them and told them, there were – in fact – valuables in the house. He used that distraction to escape.

19. On December 9, 2020, a Federal Grand Jury in the Middle District of Pennsylvania indicted Steven WONG and Cornelius GREEN for violations of 18 USC 922(g)(1), felon in possession of a firearm; and 18 USC 1202(a)(1), Kidnapping. William MURPHY was indicted for violations of 18 USC 1201(a)(1), Kidnapping. Odaliz WONG was indicted for violations of 18 USC 922(a)(6), making false statements to a Federal Firearms Licensee.

20. Snowell informed investigators that GREEN and WONG utilized their cellular phones to video record his kidnapping, as well as other illegal activities, and that evidence of these crimes will be stored within their devices (ATTACHMENT B).

(Doc. 16-4, Ex. A at 7-9). In addition to the Affidavit in Support of the Search Warrant, the recorded interview between ATF agents and Ishmael Snowell that took place on November 16, 2020, is relevant to Defendant's claims of omissions and representations contained in the Warrant Application. (*See* Doc. 16-15, Ex. L).

## III. ANALYSIS

Defendant contends that's the evidence seized pursuant to the January 5, 2021 Search Warrant executed on January 7, 2021, must be suppressed because the execution of the warrant was "untimely," the Magistrate Judge "lacked a substantial basis for concluding that agents had probable cause to believe evidence of a crime would be found there," the Warrant was overbroad, and the Warrant "contained materially false statements and omissions, knowingly or recklessly made." (Doc. 17 at 2). For purposes of the instant Opinion, the Court will only address the *Franks* issue embedded within Defendant's Motion.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the United States Supreme Court held:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks*, 438 U.S. at 155–56. Thus, *Franks* established a two-part test to allow a defendant to overcome the presumption that an affidavit of probable cause supporting a search warrant is valid. *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). First, a criminal defendant must make a "substantial preliminary showing" to overcome the presumption that the affidavit supporting the search warrant is valid. *Id*. Only if this initial showing is made is a defendant entitled to a *Franks* hearing. *Id*.

> *Franks* elucidated the initial showing required:
>
> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient . . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient

4

content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Franks*, 438 U.S. at 171-72. To overcome the presumption of validity, a defendant must do more than construct a self-serving statement which refutes the warrant affidavit. *Id. at 171.* *United States v. Reed,* 726 F.2d 339, 342 (7th Cir.1984); *see also United States v. Strube*, No. CR.1:97-CR-0108-02, 1997 WL 33482969, at *3 (M.D. Pa. July 24, 1997) (supporting statements from the defendant and his wife self-serving).

In determining whether a statement was recklessly made,

> the rule is that an assertion is made with reckless disregard when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported. This definition provides two distinct ways in which conduct can be found reckless: either the affiant actually entertained serious doubts; or obvious reasons existed for him to do so, such that the finder of fact can infer a subjectively reckless state of mind.

*United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011) (internal citations and quotation marks omitted). Similarly, omissions are made with reckless disregard for the truth "if an officer withholds a fact in his ken that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). An omission or assertion is "material" when "probable cause does not exist under the corrected affidavit." *Yusuf*, 461 F.3d at 383.

In sum, a defendant must "allege with specificity what was false in the affidavit, must provide proof, must allege that the affiant had a culpable state of mind, and *must allege that*

*the remaining information is insufficient to support a finding of probable cause."* United States v. Yokshan, 431 F. App'x 170, 173 (3d Cir. 2011) (citing *Franks*, 438 U.S. at 171-72).

Here, Defendant argues that the Court should schedule a *Franks* hearing because:

> Agent McKinney deprived the magistrate of critical information bearing on Ishmael Snowell's credibility. He did so recklessly because, under the circumstances, any reasonable agent would know to do what McKinney did not – provide the magistrate with information concerning the informant's criminal history, pending charges, ongoing criminal activity, and expectations regarding benefits from his cooperation.

(Doc. 17 at 13-14). According to Defendant, Agent McKinney intentionally omitted information about Snowell's four prior criminal convictions and his pending criminal charges, which was "relevant to Snowell's character for truthfulness." (*Id.* at 14). Defendant contends that this information

> was relevant in relation to Snowell's motivation for bringing his kidnapping accusations to law enforcement. Had McKinney duly informed the magistrate, the magistrate likely would have questioned whether Snowell's information was tainted by a desire for dismissal of the charges, leniency at sentencing, law enforcements' blind eye to his ongoing drug trafficking operation, or other benefits.

(*Id.* at 15 (footnote omitted)).

In response, the Government argues that Defendant mischaracterizes Snowell as an "informant" when Snowell "is nothing more than a private citizen complainant" because "[h]e is a crime victim." (Doc. 25 at 14). The Government notes that "Snowell did not seek out law enforcement to provide information" and "the only reason Snowell had contact with police was that a concerned citizen called 911 to the crime scene." (*Id.* at 15). The

Government emphasizes that Snowell "was not working with law enforcement, under criminal investigation, seeking compensation, or requesting assistance with criminal charges." (*Id.* at 14-15).

"The veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted." *United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007) (citing *Caldarola v. Calabrese*, 298 F.3d 156, 165-66 (2d Cir. 2002); *United States v. Rollins*, 522 F.2d 160, 164 (2d Cir. 1975)). As explained by the First Circuit,

> Victims' complaints are a prime source of investigatory information for police officers. In the absence of circumstances that would raise a reasonably prudent officer's antennae, there is no requirement that the officer corroborate every aspect of every complaint with extrinsic information. The uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause. *See, e.g., Forest v. Pawtucket Police Dep't*, 377 F.3d 52, 57 (1st Cir. 2004) [No. 03-2652] (stating that information furnished by a victim is generally considered sufficiently reliable to support a finding of probable cause); *B.C.R. Transport [Co. v. Fontaine]*, 727 F.2d [7, 20 (1st Cir. 1984)] (same).

*Acosta v. Ames Dept. Stores, Inc.*, 386 F.3d 5, 10 (1st Cir. 2004). "A victim of a crime is considered to be reliable unless evidence in the affiant's possession indicates the contrary." *United States v. Huslage*, 480 F.Supp. 870, 874 (W.D.Pa. 1979); *see also United States v. Mahler*, 442 F.2d 1172, 1174 (9th Cir. 1971) ("Nor, when the informant is the victim of the crime, need it be shown by other facts, that she is a reliable informant.").

7

Here, no "special circumstances" exist, and nothing indicates that Agent McKinney possessed any information that would call Snowell's veracity into question. *See United States v. Rumney*, 867 F.2d 714, 720-21 (1st Cir. 1989) ("A criminal record, no matter how lengthy, does not necessarily impugn one's veracity."). Snowell was not an "official" or "professional" informant for law enforcement whose credibility needed to be established, as Snowell did not receive any benefits, such as money or the potential for assistance with pending criminal charges. Snowell's status as a crime victim and nothing more becomes clear when his treatment in the Affidavit is contrasted with that of an unnamed Confidential Source referred to in the Affidavit. (Doc. 16-4, Ex. A at 10-11). As a Confidential Source, Agent McKinney properly established his credibility and reliability, which is something he did not do, and did not need to do, when discussing the information obtained from Snowell. (*Id.* ("Stewart stated that D.R. is a reliable and credible source, who has furnished information in the past which has resulted in numerous arrest and search warrants.")).

Snowell did not wait to provide information to the police until after he was arrested on other charges. *See United States v. Livingston*, 445 F. App'x 550, 554-56 (3d Cir. 2011) (holding that omitting the fact that the witness "initially lied to the police about her identity, had several outstanding warrants for her arrest, and gave law enforcement information about [the defendant's] robberies only *after* her arrest" was not material to the finding of probable cause and did not require a *Franks* hearing). In fact, Snowell did not approach law enforcement himself – he only provided information to the police when a "concerned citizen

8

called 911 to the crime scene" and then he later agreed to talk to ATF agents about testifying before the grand jury. (Doc. 25 at 15). The agents reference the police report Snowell made after the kidnapping during their discussion, and at no point during the interview did the agents raise any suspicion that Snowell changed his account of events, meaning that the agents has "no plausible reason to doubt the veracity of the information that [they] plan[ned] to include in the warrant application," therefore "failure to take further steps to verify that information is not reckless." *United States v. Barbosa*, 896 F.3d 60, 71 (1st Cir.) (citing *United States v. Tanguay*, 787 F.3d 44, 52 (1st Cir. 2015)). Law enforcement agents interviewed Snowell in his capacity as a victim, and Snowell's status as a felon does not deprive him of the possibility that he, too, could be a victim of a crime. *Id.* at 73 ("[W]e know of no rule requiring a police officer to run a comprehensive criminal record check before giving credence to a victim's account." (citing *United States v. Miller*, 753 F.2d 1475, 1478 (9th Cir. 1985) (per curiam)).

Defendant argues that the law enforcement agents that interviewed Snowell regarding Defendant and his coconspirators made promises to Snowell in exchange for his grand jury testimony. (Doc. 17 at 15-16). In particular, Defendant asserts:

> Indeed, Snowell would have been justified in expecting to benefit from approaching law enforcement. McKinney's affidavit omits it, but ATF agents encouraged Snowell to testify before the grand jury pledged (*inter alia*) to turn a blind eye to his criminal activities ("whatever side hustle you got, we don't give a sh@! about"), to "erase" the defendants (whom Snowell likely viewed as his competitors in the drug trade), and to treat Snowell as a "friend" they would "protect" from the defendants, which agents explained could include "a job" and "money if you need it." Ex. L at 2:00-5:30; 14:00-16:30; 25:00-34:00.

(*Id.* at 15-16).

The agents needed to reassure Snowell that he would be protected in the event Defendant and his coconspirators intimidated, threatened, or retaliated against him for his cooperation. They explained to Snowell that any criminal activity he was involved in was beyond the scope of their investigation. Although Defendant alleges that they "turn[ed] a blind eye to his criminal activities," (Doc. 17 at 15), the agents instead wanted to ensure that Snowell felt comfortable speaking with them about his alleged kidnapping. Defendant is correct that the agents stated, "whatever side hustle you got, we don't give a shit about." (Doc. 16-15, Ex. L at 02:10-02:14). However, this statement was made to reassure Snowell that the ATF investigation did not concern any illegal conduct he may have been involved in. The agents told Snowell that they were there to discuss the alleged kidnapping he reported to police, and they made it clear that their investigation did not include Snowell's conduct. (*Id.* at 02:10-04:20 (explaining that they are not concerning with Snowell's conduct and they are there to discuss the possibility of Snowell testifying before the grand jury).

As a victim of alleged crimes, Snowell had every right to report the incident to law enforcement without fear that the very agents interviewing him would arrest him during or shortly after the interview. Moreover, Snowell's arrest in March 2021 conclusively shows that law enforcement did not "turn a blind eye" to Snowell's alleged illegal activities. (*See* Doc. 16-14, Ex. K). Simply because the agents determined that their discussion with Snowell was not the time or place to question him about illegal activity he may have been

10

involved in does not lead to the conclusion that the agents were reckless in omitting reference to Snowell's alleged criminal conduct from the Warrant application. *See Barbosa*, 896 F.3d at 73 ("[W]e know of no rule requiring a police officer to run a comprehensive criminal record check before giving credence to a victim's account." (citation omitted)).

Moreover, Defendant grossly mischaracterizes the substance of Snowell's recorded interview with law enforcement. In the interview, the agents state:

> **Agent A:** Your kidnapping and your name is gonna be associated with this.
>
> **Snowell:** Yeah, I get it.
>
> **Agent A:** Now, it's better for us and it's a better case for us if we can get you to go to grand jury. Now the grand jury is secret.
>
> **Agent B:** A hundred percent – that was the part I make sure, yeah – it is a hundred percent secret. Nobody knows who you are.
>
> **Agent A:** Nobody knows you're there.
>
> **Snowell:** Okay, yeah, okay cool.
>
> **Agent A:** It's a hundred percent secret. But with that, if you're on board, if anything ever happens or anybody threatens you, you are now our witness. You're our friend and we can protect you. If you need to be moved, we'll move you. If you need to be hidden, we'll hide you.
>
> **Agent B:** We'll get you a job.
>
> **Agent A:** We'll help you get a job.
>
> **Agent B:** Get you a new identity.
>
> **Agent A:** We can give you money if you need it. So that's why we're here talking to you today.

> **Snowell:** Okay, cool.
>
> **Agent A:** Are you on board with that?
>
> **Snowell:** Yeah, I'm fine with that.

(Doc. 16-15, Ex. L at 03:34-04:20).  Toward the end of the interview, the agents reiterated:

> **Agent A:** Once you're on board, that-that opens the, the-the doorway for us to help you out.  You know, if-if you just said no, I don't want to be involved then that's fine, but then when shit goes down we can't –
>
> **Snowell:** No, I understand.  No, a hundred percent, I get it.
>
> **Agent A:** You know what I mean?  We're like partners in this now, so that's how we're gonna roll.

(*Id.* at 33:11-33:30).

When the cherry-picked excerpts referenced by Defendant are put into their full context, it becomes clear that the agents did not offer benefits to Snowell for his testimony, as alleged by Defendant.  Instead, they offered him protection in the event "anything ever happens or anybody threatens" him.  This is not unique to Snowell, as law enforcement routinely assures witnesses that they will assist them in the event they are threatened for providing testimony or cooperating with the Government, which is a very real concern for many victims or cooperating witnesses.  (*See* Doc. 16-12, Ex. I at 1 ("[Snowell] is a victim of a kidnapping, per the Cumru Township police report and was treated as such")).  In fact, Snowell told the agents at the outset that he wanted to talk to someone about his kidnapping, but he was "kind of scared" because Defendant and his coconspirators

12

allegedly had his address and he was concerned with what they would do if they found out Snowell reported the incidents to law enforcement. (Doc. 16-15, Ex. L at 02:35-02:49).[1]

Furthermore, Defendant's reference to the agents stating they will "erase" him and his coconspirators, (see Doc. 17 at 15), amounts to little more than a colloquial, informal manner with which to refer to the pending arrests and imprisonment of Defendant and his coconspirators. Whenever the agents discuss "erasing" Green and Wong, it is done so in the context of them being arrested and sent to federal prison. For example, the agents explain to Snowell that "[o]n December 3, at the end of December 3, the federal government is gonna cut arrest warrants for Green and Wong and we're gonna erase them." (Doc. 16-15, Ex. L at 04:58-05:10). They also tell Snowell that he is an important witness, saying "[w]e feel confident that-that we can make all this happen, but with you in grand jury, it-it's a done deal. We're talking – we're – we're erasing Green and Wong for 15 years, and Murphy is gonna get wrapped into this too," and the agents then proceed to explain to Snowell how a 15-year federal prison sentence is different from a 15-year state prison sentence. (*Id.* at 15:21-16:03). The fact that Defendant and his coconspirators were under

---

[1] Defendant claims that "Snowell was not a 'crime victim' ... with respect to information he provided beyond his recounting of his alleged kidnapping on July 22, 2020." (Doc. 26 at 11). This is inaccurate. Snowell described multiple instances in which Defendant and his coconspirators allegedly victimized Snowell through robberies, "jumping" him, harassing his girlfriend to get to him, and breaking into his house. (*See, e.g.*, Doc. 16-15, Ex. L at 07:24-14:05). Snowell describes how these events were all related to one another and eventually culminated in the kidnapping. In any event, the agents had no reason to doubt the veracity of Snowell's statements, as they already had some knowledge of many of the events that Snowell corroborated and Snowell's account to ATF investigators matched his account of the same events that were included in the police report filed soon after the alleged kidnapping. (*See generally id.*).

13

federal investigation and would soon be indicted and arrested had nothing to do with bringing any benefit to Snowell, as Defendant claims. The agents tell Snowell that "[w]e were gonna go forward with this with or without you," (*Id.* at 32:55-32:58), which underscores the fact that the agents' telling Snowell that Defendant would be "erased" was based solely on their professional belief that they had sufficient evidence to move forward with a criminal case against Defendant.

Finally, Defendant contends that the interview recording "does not include Snowell 'inform[ing] investigators' that Green used his phone to 'video record [Snowell's] kidnapping, as well as [other] home invasions' or 'that evidence of these crimes will be stored within,' contrary to a central claim of McKinney's affidavit (if Snowell did not so inform agents elsewhere)." (Doc. 17 at 16). Defendant argues that the "government offers no response" to this "affirmative misrepresentation." (Doc. 26 at 11). However, nothing in the Search Warrant Affidavit indicates the time at which Snowell informed investigators that Defendant and Wong used their cell phones to record his kidnapping and other home invasions. (*See* Doc. 16-4, Ex. A at 9). Snowell had at least one other interaction with law enforcement regarding his kidnapping, as he filed a police report prior to the November 16, 2020, interview with ATF agents,[2] and it was clear during the interview that the agents and

---

[2] In fact, the agents state "So, you talked to the police about the whole when they abducted you and the whole videotaping you doing shit and everything else." (Doc. 16-15, Ex. L at 02:35-02:46). This indicates that Snowell told police that Defendant and his coconspirators recorded him with their cellphones and supports the truth of the statements attributed to Snowell contained in Affidavit in Support of the Search Warrant.

14

Snowell exchanged phone numbers and they encouraged Snowell to call them at any time if he remembered any additional information that could help them. (*See* Doc. 16-15, Ex. L at 14:05-15:15). Even Defendant himself places a caveat on his claim that Agent McKinney affirmatively misrepresented Snowell's statements to investigators and acknowledges that Snowell could have told investigators about the involvement of Defendant's phone at a different time. (Doc. 17 at 16 (noting that the statements attributed to Snowell in the Warrant Application regarding Defendant's cellphone were incorrect "*if Snowell did not so inform agents elsewhere.*" (emphasis added)). This claim falls far short of the requisite showing that Defendant must establish by a preponderance of the evidence that law enforcement made an affirmative misrepresentation in reckless disregard for the truth.

Defendant's brief is deficient in that it fails to provide the Court with a complete analysis of what is required for the Court to hold a *Franks* hearing. (*See* Doc. 17 at 13-16). Defendant does not address the second step in a *Franks* inquiry, which asks whether the alleged omission or misstatement was material to the finding of probable cause. *Yusuf*, 461 F.3d at 383-84. To demonstrate that the omission was material, "the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit." *Id.* at 383. Although the Court does not believe omitting reference to Snowell's criminal background was done in "reckless disregard for the truth," the Court will address, *arguendo*, whether this omission was material to the probable cause finding.

The Court is not persuaded that including information about Snowell's criminal background would be material to the finding of probable cause. While it may be true that the Magistrate Judge would want to know about Snowell's background, this "is not the standard [the Third Circuit] set in *Yusuf*." *Livingston*, 445 F. App'x at 556. ("But what the magistrate judge 'would want to know' is not the standard we set in *Yusuf*. The central question is instead whether, when the omitted facts are added to the affidavit, probable cause would still exist[.]"). Furthermore, the notion that "the magistrate likely would have questioned whether Snowell's information as tainted by a desire for dismissal of the charges, leniency at sentencing, law enforcement's blind eye to his ongoing drug trafficking operation, or other benefits" is nothing more than speculation and not a ground upon which Defendant can support his request for a *Franks* hearing. (Doc. 17 at 15). Speculation about what the Magistrate Judge "likely would have done" is woefully insufficient to establish by a preponderance of the evidence that the inclusion of Snowell's criminal background would have led to the conclusion that probable cause does not exist.

If the Court were to assume *arguendo* that the omission of Defendant's criminal history and pending criminal charges or the alleged affirmative misrepresentation of Snowell's statements to investigators shows "reckless disregard for the truth" and this information was either included or corrected in the Search Warrant application, a thorough review of the Warrant Application shows that "there remains sufficient content in the warrant affidavit to support a finding of probable cause [and] no hearing is required." *Franks*, 438

16

U.S. at 172. None of the information that this Court has accurately described herein, as opposed to the distorted and truncated version offered by Defendant, was necessary for inclusion in the affidavit and its omission does not vitiate the accuracy or truthfulness of the facts set forth in the Affidavit. Phrased, differently, the omissions complained of did not prop up an otherwise defective affidavit. Because Defendant has not satisfied his burden of establishing that he is entitled to a *Franks* hearing to show that suppression of evidence is warranted based on material omissions and misrepresentations in the Search Warrant, his Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment to the United States Constitution (Doc. 16) is properly denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant's request for a *Franks* hearing in his Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment to the United States Constitution (Doc. 16) will be denied with the result that no *Franks* hearing will be held in conjunction with the Evidentiary Hearing scheduled for July 1, 2022. A separate Order will follow.

Robert D. Mariani
United States District Judge